1 | J.A. Hudson, CSB #85799
2 | Hugo N. Gerstl, CSB #37927
  | GERSTL & HUDSON
3 | 2450 Garden Road, Suite C
  | Monterey, CA 93940
4 | Telephone: (831) 649-0689
  | Facsimile: (831) 649-8007
5 | E-mail: Art@gerstlandhudson.com

**FILED**

DEC 1 2 2006

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
APRILL CAMPBELL DEPUTY

6 | Attorneys for: Plaintiffs

7 | SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

8
9 | MICHAEL R. ALLEN and CONTINENTAL
  | NURSING MANAGEMENT SERVICES, INC.,
10| an Arizona corporation,           Plaintiffs,
  |                         vs.
11|
  | J. CRAIG HAMILTON, JR., individually and as
12| Trustee of PLEXCO TRUST, JOHN D.
  | FARRALD as Trustee of PLEXCO TRUST,
13| PLEXCO TRUST, a California trust, JRL
  | PROPERTIES INTERNATIONAL, INC., a
14| Texas corporation, and DOES 1-10, inclusive,

CASE NO.  M81975

AMENDED COMPLAINT FOR DAMAGES
1.  Common Count
2.  Breach of fiduciary duties
3.  Unjust enrichment
4.  Breach of written contract

15 | **PRELIMINARY ALLEGATIONS**

16 | 1.  Plaintiffs do not know the true names or capacities of Defendants sued herein as

17 | DOES.

18 | 2.  At all times herein mentioned, Plaintiff MICHAEL R. ALLEN, was, and now is, an

19 | individual (hereafter "ALLEN"), was, and now is, a resident of Maricopa County, Arizona. At all

20 | times herein mentioned, Plaintiff CONTINENTAL NURSING MANAGEMENT SERVICES, INC.

21 | was and now is a corporation duly organized and existing under and by virtue of the laws of

22 | Arizona, authorized to do and doing business as an operator and manager of nursing care

23 | facilities.

24 | 3.  At all times herein mentioned, Defendant J. CRAIG HAMILTON, JR. (hereafter

25 | "HAMILTON") was a resident of Monterey County, California. At all times herein mentioned,

26 | said defendant was the dominant Trustee of Defendant PLEXCO TRUST, a Trust which was

27 | set up under the laws of the State of California and which has its principal domicile and

28 |

-1-

1  residence in Monterey County, California; the other Trustee of said Trust was and is Defendant

2  JOHN D. FARRALD.

3      4.  At all times herein mentioned Defendant JRL PROPERTIES INTERNATIONAL, INC.

4  was, and now is, a corporation duly organized and existing under and by virtue of the laws of

5  Texas, authorized to do and doing business as an owner and operator of nursing homes in

6  Texas and elsewhere. Defendant HAMILTON, individually and/or as trustee of PLEXCO

7  TRUST, was, and now is, the sole shareholder and director of JRL PROPERTIES

8  INTERNATIONAL, INC.  Plaintiff is informed and believes and thereon alleges that Defendant

9  JRL PROPERTIES INTERNATIONAL, INC. is presently in Chapter 11 Bankruptcy and subject

10  to the automatic stay generated by 11 U.S.C. §362. In order to avoid running afoul of 11 U.S.C.

11  §362, Plaintiffs do not seek affirmative relief against JRL until they are relieved of the provisions

12  of the automatic stay.

13      5.  Plaintiffs are informed and believe and thereon allege that at all times herein

14  mentioned each defendant was, and now is the agent, employee, and representative of the

15  remaining defendants, and each of them, acting within the course and scope of such agency,

16  employment, and representative capacity with respect to all matters herein contained. Plaintiffs

17  are informed and believe and thereon alleges in addition to the above, and/or in the alternative,

18  that at all times herein mentioned, each defendant was, and now is, the copartner, joint venturer,

19  or associate of the remaining defendants, and each of them, acting within the course and scope

20  of such copartnership, joint venture and/or association with respect to all matters herein

21  contained.

22      6.  Plaintiffs are informed and believe and thereon allege that at all times from on or about

23  November 20, 2000 forward, there existed and now exists a unity of interest and ownership between

24  defendants PLEXCO TRUST and JRL PROPERTIES INTERNATIONAL, INC., and each of them

25  (hereafter "corporation" or "corporate defendant" and/or "the trust") and defendant J. CRAIG

26  HAMILTON, JR. (hereafter "individuals," or "individual defendants" or "CRAIG"), such that any

27  individuality between the individual defendant and the corporate and/or trust defendants have

28  ceased and defendant corporations are the alter egos of said individual defendants in that:

-2-

a. Said individual defendant has dominated, influenced, and controlled all activities, ventures, and assets of the corporate and/or trust defendants at all times relevant to the allegations contained herein.

b. The corporate and/or trust defendants are, and at all times herein mentioned were, mere shells and shams without capital or assets. Said corporate and/or trust defendants were used by said individual defendant as devices to avoid individual liability and for the purpose of substituting financially insolvent corporate and/or trust defendants in place and stead of the financially responsible individual.

c. The corporate and/or trust defendants are and at all times herein mentioned were, so inadequately capitalized that, compared with the business to be done by the corporate and/or trust defendants and the risks attendant thereon, their capitalization was illusory or trifling.

d. Said individual defendant used assets of the corporate and/or trust defendants for his personal uses, caused assets of the corporate and/or trust defendants to be transferred to him without adequate consideration, commingled individual and corporate and trust assets, and manipulated the corporate and trust assets to their/his advantage and to the disadvantage of creditors in general and plaintiff in particular.

e. The corporate and/or trust defendants were, and now are, mere shells and conduits through which said individual defendant carried on his own business ventures exactly as he had done prior to the incorporation of defendant corporation and the execution of said defendant trust..

f. The activities and business of the corporate and/or trust defendants were carried on without proper or appropriately noticed corporate and/or trust formalities, adequate records, or adequate protection of the best interests of the corporate and/or trust defendants. In the event this court does not pierce the corporate and trust veils, plaintiffs will suffer great and irreparable injuries and damages in that the truly liable party, the individual defendant, will avoid financial responsibility

-3-

through the fraudulent use of "dummy" corporations and/or trusts; such activity would sanction a fraud and promote injustice.

7. By virtue of their business relationship, there was created, and existed from November 20, 2000, and still exists to this day, a fiduciary relationship between Plaintiff ALLEN and Defendant HAMILTON.

8. On or about November 20, 2000, at Carmel, California, Phoenix, Arizona, and Lufkin, Texas, Plaintiff and Defendant HAMILTON conceived of a project wherein PLEXCO TRUST would purchase and operate a series of elder care facilities in the State of Texas, from the bankruptcy estate of a company called JRL INTERNATIONAL, INC. Under their plan, the following would take place:

a. A new company, JRL PROPERTIES INTERNATIONAL, INC. ("JRL") would be formed. Although HAMILTON and/or PLEXCO TRUST would own all shares in JRL, would make all decisions of every kind concerning JRL, and would handle all of the finances of JRL, Plaintiff ALLEN would be given the *title* of President for purposes of day-to-day operating authority.

b. JRL would enter into a written management agreement with Plaintiff CONTINENTAL NURSING MANAGEMENT SERVICES, INC. ("CONTINENTAL"). Although Plaintiff ALLEN owned all shares in CONTINENTAL, would make all decisions of every kind concerning CONTINENTAL, and would handle all of the finances of CONTINENTAL, one KANDY S. APACHE, an associate of Plaintiff ALLEN, would be charged with the ability to handle the administration of the contract contemplated between ALLEN and HAMILTON, so that it would appear to those concerned with the business aspects of JRL and CONTINENTAL that the two entities would be dealing at arm's length with one another.

9. On or about November 20, 2000, Defendants HAMILTON and PLEXCO TRUST bought the name and/or the assets consisting of a series of nursing homes, of JRL INTERNATIONAL out of bankruptcy.

-4-

10. On or about November 20, 2000, JRL PROPERTIES INTERNATIONAL, INC. and CONTINENTAL NURSING MANAGEMENT SERVICES, INC., for valuable consideration consisting of promises, commitments, and undertakings for work, labor, services, and money, entered into a written management services agreement, a copy of which is attached hereto, designated Exhibit "A," and incorporated herein by reference.

11. Under the terms of the Management Services Agreement, CONTINENTAL was to provide management services to JRL, for which it would receive a management fee as more particularly set forth in Paragraph 6 of the Agreement.

12. Pursuant to Paragraph 7 of the Agreement, "Owner (JRL / HAMILTON / PLEXCO) shall indemnify and hold Manager (CONTINENTAL / ALLEN) harmless from and against all claims, demands, costs, expense, liabilities, and losses, including reasonable attorneys' fees arising out of or in connection with the provision by Manager (CONTINENTAL / ALLEN) of management services ... arising out of or in connection with any acts of the Owner (JRL / HAMILTON / PLEXCO), its employees, agents or contractors ..."

13. The understanding between HAMILTON and ALLEN was that each of them would, as de facto copartners (albeit functioning through different entities) operate the nursing care units and share the profits therefrom.

14. Between November 20, 2000 and February, 2004, the parties operated under the subject "Management Agreement." However, to all intents and purposes, HAMILTON / PLEXCO made all financial decisions of and concerning the operation of the Nursing Care facilities.

15. Among other things, HAMILTON / PLEXCO unilaterally elected to pay some expenses but not others. During the period November 20, 2000 through on or about June 30, 2003, HAMILTON / PLEXCO made a conscious decision not to pay or deposit payroll taxes.

16. In or about September 26, 2003, "JRL" (HAMILTON / PLEXCO) for no good cause and without proper notice, "terminated" CONTINENTAL'S (ALLEN'S) "Management Agreement;" and ceased paying CONTINENTAL (ALLEN) any monies.

17. On or about July 23, 2004, HAMILTON / PLEXCO as the actual owners of JRL, filed a Chapter 11 Bankruptcy Petition on behalf of JRL, Case No. 04-47072-DML-11 in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Plaintiff is informed and believes and thereon alleges that said Bankruptcy continues to this date.

18. As part of the Bankruptcy petition, JRL listed assets of $14,154,104.33 and liabilities of $5,466,589.23. Among the liabilities listed was an unsecured indebtedness to the Internal Revenue Service of $2,700,000 for taxes.

19. In the latter part of 2004 and early 2005, the IRS, commenced collection activities against ALLEN individually, pursuant to a "100% penalty assessment," for the tax liability of JRL.

20. ALLEN contended that he, individually, had no liability to the IRS on account of JRL'S indebtedness because:

a. Although ALLEN was an officer of JRL, he did not have final authority as to which creditors were paid and he did not determine when creditors would be paid.

b. HAMILTON made all decisions as to who got paid and when, and was the co-trustee, with co-defendant Farreid, of defendant PLEXCO TRUST, which owned all of the stock of JRL.

21. Throughout the period of July 23, 2004 through December 31, 2005, ALLEN continually advised HAMILTON and PLEXCO TRUST that it was *their* responsibility, not ALLEN'S, to pay the IRS claim. Although HAMILTON gave evasive and contradictory answers to ALLEN'S demands, and indicated that HAMILTON/PLEXCO would be responsible for payment of the IRS claim, neither HAMILTON nor PLEXCO TRUST paid any portion of the IRS claim.

-6-

22. In December, 2005, the INTERNAL REVENUE SERVICE commenced involuntarily seizing the bank accounts of ALLEN, his wife, and his children. In order to salvage his own assets, ALLEN paid the IRS $1,200,000 in March, 2006.

23. Since that time, ALLEN has continued to request and demand that HAMILTON and PLEXCO TRUST reimburse him the $1,200,000 plus interest, but HAMILTON and PLEXCO TRUST have failed and refused and still fail and refuse to do so.

**FIRST CAUSE OF ACTION**
**(Common counts – Plaintiff MIKE ALLEN Against All Defendants)**

24. Plaintiff repleads and incorporates herein by reference paragraphs 1-21 of the preliminary allegations.

25. Within two years last past, at Monterey County, California, Defendants, and each of them, became indebted to Plaintiff MIKE ALLEN as follows:

   a. On Open Book account for money due.

   b. For money had and received by Defendants for the use and benefit of Plaintiff.

   c. For money lent by Plaintiff to Defendants at Defendants' special instance and for which the Defendants derived benefit.

   d. For money paid, laid out, and expended to or for the defendants' benefit at defendants' special instance and for which Defendants derived benefit,

26. The amount due, owing, and unpaid from Defendants to Plaintiff is $1,200,000, together with interest on said sum at the rate of 10% per annum from March 1, 2006 until paid.

27. Pursuant to Paragraph 7 of Exhibit "A," Plaintiff is entitled to attorneys' fees. Plaintiff claims reasonable attorneys' fees according to proof.

-7-

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duties – Against All Defendants)

28. Plaintiffs incorporate herein by reference paragraphs 1-21 of their preliminary allegations.

29. At all times herein mentioned, there existed and now exists a fiduciary duty between Defendants HAMILTON and PLEXCO TRUST on the one hand, and Plaintiffs on the other, wherein and whereby Defendants owed the highest good faith and fair dealing toward the Plaintiffs.

30. Between February, 2004 and the present date, Defendants, and each of them, breached their fiduciary duties to Plaintiff by the following acts:

a. Unilateral and arbitrary termination of Plaintiffs' managerial duties at a time when Defendants, and each of them, were indebted to Plaintiffs in a sum of between $300,000 and $500,000. The exact amount of such indebtedness is presently unknown to Plaintiffs, who will ask leave to amend this complaint to conform to proof at time of trial.

b. Failure to pay or indemnify Plaintiffs for payment of $1,200,000 to the INTERNAL REVENUE SERVICE, which was Defendants' sole obligation.

31. As a direct and proximate result of Defendants' breach of fiduciary duties, Plaintiffs have suffered damages as follows:

a. Money due for work, labor, and services in the amount of between $300,000 and $500,000, according to proof, together with interest thereon at the rate of 10% per annum from February, 2004 until paid.

b. $1,200,000 together with interest thereon at the rate of 10% per annum from March 1, 2006 until paid:

c. Attorneys' fees incurred herein, according to proof.

32. Defendants' acts constituted constructive fraud and were made with conscious disregard for Plaintiffs' rights. By virtue thereof, Plaintiffs ought to recover and Defendants ought to suffer exemplary and punitive damages commensurate with their wealth.

-8-

### THIRD CAUSE OF ACTION
### (Unjust enrichment – Plaintiffs against all Defendants)

33. Plaintiffs replead and incorporate herein by reference paragraphs 1-29 of their preliminary allegations, and each and every paragraph and provision contained in their first and second causes of action. By virtue of the premises, defendants will be unjustly enriched if their conduct is tolerated by the Court in such sums as shall be proved in Court.

34. Because of their wrongful acts, defendants, and each of them, hold that property alleged hereinabove in constructive trust for the use and benefit of the plaintiff(s); and this court, in the exercise of its equitable jurisdiction, should so order.

### FOURTH CAUSE OF ACTION
### (Breach of Written Contract – Plaintiff against All Defendants)

35. Plaintiffs replead and incorporate herein by reference paragraphs 1-29 of their preliminary allegations.

36. On or about November 20, 2000, for valuable mutual consideration, Plaintiffs and Defendants entered into a written contract, a copy of which is attached hereto, designated Exhibit "A" and incorporated herein by reference.

37. Plaintiffs have performed all acts required of them to be performed under the subject contract.

38. On and after February 1, 2004, Defendants breach said written contract by unilaterally terminating said Agreement without notice or cause, by failure to pay Plaintiffs the amounts due and owing to them under said agreement, and by failing to indemnify Plaintiffs as required by said agreement.

39. As a direct, proximate, and foreseeable result of Defendants' breach of contract as aforesaid, Plaintiffs have suffered damages as follows:

-9-

a. Money due for work, labor, and services in the amount of between $300,000 and $500,000, according to proof, together with interest thereon at the rate of 10% per annum from September 2003 until paid.

b. $1,200,000 together with interest thereon at the rate of 10% per annum from March 1, 2006 until paid.

c. Attorneys' fees incurred herein, according to proof.

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants, and each of them, as follows:

1. For money due for work, labor, and services in the amount of between $300,000 and $500,000, according to proof, together with interest thereon at the rate of 10% per annum from February, 2004 until paid.

2. For $1,200,000, which Plaintiff paid to the IRS on Defendants' behalf, together with interest thereon at the rate of 10% per annum from March 1, 2006 until paid.

3. For exemplary and punitive damages commensurate with Defendants' wealth.

4. For attorneys' fees and costs incurred herein, according to proof; and

5. For such other and further relief as to this Court shall seem just.

Dated: December 11, 2006

GERSTL & HUDSON

By: J.A. HUDSON
Attorneys for Plaintiffs

-10-

## MANAGEMENT SERVICES AGREEMENT

THE MANAGEMENT SERVICES AGREEMENT ("Agreement") is made as of the 20 day of November, 2000, by and between JRL PROPERTIES INTERNATIONAL, INC., a Texas corporation ("Owner") and CONTINENTAL NURSING MANAGEMENT SERVICES, INC., an Arizona limited liability company ("Manager").

**BACKGROUND**

Manager is in the business of furnishing management services to healthcare facilities. Owner owns nursing facilities located in the State of Texas identified in Attachment A ("Facilities"). Owner and Manager desire that Owner retains Manager to provide management services to the Facilities.

Accordingly, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Owner and Manager agree as follows:

1. **Management Services:**

   (a)     Commencing on November 20, 2000, ("Commencement Date") and continuing until November 19, 2010 or earlier termination of this Agreement, Manager shall provide management services (collectively "Services"), Manager shall provide or cause to be provided the Services as outlined in Attachment B as attached hereto, and made a part hereof.

   (b)     Notwithstanding anything contained herein to the contrary, Owner shall have control of the Facilities and Owner reserves the right to make all decisions regarding the Facilities not expressly delegated to Manager hereunder.

2. **Employees:**

   (a)     All employees working at or in connection with the operation of the Facility shall be employees of the Manager. All salary, fringe benefits and related expenses payable to such employees shall be Manager's sole expense.

3. **Conflicts of Interest; Competition:** Owner is aware and understands that the Manager may operate or manage other health care facilities located throughout the State of Texas, some of which may potentially be in such proximity to Owner's Facilities so as to be competing in the same market,  consents to Manager's operation or management of such competing facilities, and waives any claims arising from such activities by Manager other than intentional fraud of Owner by Manager. Manager agrees to reasonably assist Owner in marketing admissions and referrals and to refer discharged residents to other Owner Facilities whenever possible. Manager agrees to not manage any other health care facilities within 50 (Fifty) miles of Lufkin Nursing Center or The Gardens, without Owner approval.

4. **Insurance:** Throughout the term of this Agreement, Manager shall attempt to locate a policy of general and professional liability insurance, in a minimum amount of One Million Dollars ($1,000,000) each occurrence and Five Million Dollars ($5,000,000) in the aggregate, covering bodily injury (including death) and property damage at each Facility. Manager shall deliver a certificate evidencing the foregoing insurance coverage to Owner at least Fifteen (15) days prior to the Commencement Date and shall provide Owner proof of continued insurance at least Fifteen (15) days prior to the expiration or cancellation of its current policy. Further, Owner shall name Manager as an additional insured on Owner's general liability and professional liability insurance.

5. **Term of Agreement; Termination by Manager:** The term of this Agreement shall be for a period of Ten (10) years commencing on the Commencement date ("Term"). If neither party has provided written notice to the

*EXHIBIT "A"*

other at least Ninety (90) days prior to the expiration of the term, this Agreement shall be deemed to have been renewed for an additional One (1) year term.

Notwithstanding this Section 5 or any other Section of this Agreement, Manager or Owner may terminate this Agreement, as it pertains to any one or more of the Facilities, without cause or penalty, upon Ninety (90) day's written notice.

6.    **Management Service Fee ("Fee")**: Except as otherwise provided for in this Agreement, for the Services outlined in Attachment B, the monthly fee paid by the Owner to the Manager for the term of this Agreement ("Management Fee") shall be equal to 5% of the gross operating revenues of Owner's Facilities. Manager shall be paid such 5% amount on a monthly basis as its prospective fee, based on 85% of the perspective portion of revenue. The payment of the Management Fee will be made on the first (1st) day of each month in advance for such month, which can only be withheld in accordance with the Bond Financing Documents (as defined in Section 11) and the agreement to subordinate fees set forth in Section 11. The exact amount of the Management Fee shall be reconciled to actual at the end of each month. Manager agrees to take a maximum of $15,000.00 per month and accrue the remainder due until there is a $5,000.00 minimum distribution to Plexco and a $5,000.00 minimum distribution to Huntington Properties.

> (a)    "Gross Operating Revenues" shall mean the gross revenues of each Facility as defined in accordance with generally accepted accounting principles ("GAAP") minus contractual allowances and allowances for bad debts, using the accrual basis of accounting.

> (b)    In the event that the Fee payable by Owner to Manager hereunder is determined by the Internal Revenue Service or other appropriate authority not to comply with the applicable laws and regulations, Owner and Manager agree to negotiate in good faith to modify the structure of the Fee to achieve compliance while preserving the economic terms to the greatest practicable extent.

7.    **Indemnification**: Owner shall indemnify and hold Manager harmless from and against all claims, demands, costs, expense, liabilities and losses, including reasonable attorneys' fees ("LOSSES") arising out of or in connection with the provision by Manager of management services hereunder, arising out of or in connection with any acts of Owner, its employees, agents or contractors; provided, however, that Owner shall not be obligated to provide indemnification for any Losses incurred as a result of Manager's intentional illegal, negligent or willful misconduct.

8.    **Event of Default, Remedies, and Rights of Termination**: The occurrence of any one or more of the following shall constitute default by the indicated party under this Agreement an ("Event of Default"):

> (a)    **Default by Manager**:

>> (i)    Manager fails to perform any of its obligations under the terms of this Agreement and such failure is not cured within thirty (30) days after has given written notice to Manager specifically describing such failure and demanding that it be remedied; or

>> (ii)   Manager is (A) dissolved or liquidated, (B) applies for or consents to the appointment of a receiver, trustee, or liquidator of all or a substantial part of its assets, (C) files a voluntary petition in bankruptcy, (D) makes a general assignment for the benefit of creditors, (E) files a petition or an answer seeking reorganization arrangement with creditors or to take advantage of any insolvency law, or (F) suffers an order, judgement or decree to be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointed a receiver, trustee or liquidator for Manager of all or of a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of Sixty (60) consecutive calendar days.

2

S.   **Financial Statements to Owner**:  Manager shall render the following statements to Owner during the term hereof:

(1) **Monthly Statements**:  On or before the last day of each calendar month after the Commencement Date, Manager shall cause to be rendered to Owner, and to any persons designated by Owner, a detailed balance sheet, statements of income and expenses, cash flow statements, and a statement of changes in financial position of the Facilities for the preceding calendar month and for the portion of the operating year which ended on the last day of such preceding calendar month and shall also prepare all monthly reports required by the debt instruments, if any.  Manager shall provide a monthly financial projection report, projecting income and expenses month by month for the next Six (6) months.

(2) **Monthly Reports**: Manager shall deliver to Owner monthly, at the same time as the statements called for by Section U (1) are delivered, a written budget variance analysis report containing such information as is reasonably necessary to inform Owner of the financial, operational, and marketing status of the Facility ("Monthly Report").

(3) **Annual Statements**: Manager shall render to Owner, and to any persons designated by Owner, within 120 days after the end of each operating year, a balance sheet of the Facilities as of the end of such year, and a statement of income and statement of changes in financial position for such year, in form satisfactory to Owner, reviewed by certified public accountants designated by Owner.  At Owner's request and expense, said financial statements will be audited by certified public accountants designated by Manager and approved by Owner.

(4) Manager shall prepare any special reports that the Owner may request from time to time.

(5) Manager shall present the financial statements, reports and budgets identified in this Section (u) at meetings of the board of directors.  Expenses for travel and expenses related to attending the board meeting will be the responsibility of Manager and shall not be charged back to Owner.

T.   Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, Manager shall, upon written request, as provided in section 1861 (v)(1)(1) of the Social Security Act and regulations promulgated thereunder, make available to the Secretary of Health and Human Services, the Comptroller General of the United States or any of their duly authorized representatives, this Agreement, and all books, documents and records of Manager that are necessary to verify the nature and extent of the cost of any services furnished pursuant to this Agreement for which payment may be made under the Medicare Program

U.   If Manager carries out any of its duties under this Agreement through a subcontract (under an express written consent of Owner) or subcontracts, with a related organization or organizations, having an aggregate value or cost of Ten Thousand Dollars or more over a period of a twelve (12) month period, such subcontract or subcontracts, shall contain a clause to the effect that until the expiration of four (4) years after their furnishing of such services pursuant to such subcontract or subcontracts their related organization shall, upon written request, as provided in said Section 1861 (c)(1)(1), make available to the Secretary of Health and Human Services, the Comptroller General of the United States or any of their duly authorized representative, the subcontract or subcontract, and all books, documents and records of such organization that are necessary to verify the nature and extent of the cost of any services furnished pursuant to such subcontract or subcontracts for which payment may be made under the Medicare Program.

(b)    **Default by Owner:**

    (i)    Owner fails to pay any Installment of the Fee notwithstanding provisions outlined in Section 6 hereof;

    (ii)    Owner fails to perform any material term, provision, agreement or covenant of this Agreement, and such failure continues for a period of thirty (30) days after written notice specifying such failure to perform;

    (iii)    Owner is (A) dissolved or liquidated, (B) applies for or consents to the appointment of receiver, trustee, or liquidator of all or a substantial part of its assets, (C) files a voluntary petition in bankruptcy, (D) makes a general assignment for the benefit of creditors, (E) files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or (F) suffers an order, judgement or decree to be entered by any court of competent jurisdiction, on the application of a creditor, adjudication Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator for Manager of all or a substantial part of its assets, and such order, judgement or decree shall continue unstayed and in effect for any period of sixty (60) consecutive calendar days.

    (iv)    Should there be insufficient funds available from the Owner's operation account for these purposes, Owner agrees to reimburse Manager for any amount that may be listed in the monthly financial report under outstanding Accounts Payables on accrued management fees due except as stated in Section 11. In such an event, Manager will no longer be held responsible for the debt service (mortgage or contract payments) due against the Facilities at the time such an event might take place. Manager will be permitted to pay the trade payables first, and the Owner will resume all responsibility and liability for making debt service payments. Owner at any reasonable time can inspect the records and accounts. Upon the termination of this agreement, any past due judgement(s) on receivables of the property previously not collected shall become the property of Manager.

(c)    **Remedies:** Upon any Event of Default, the party which is not in default may, at its option, terminate this Agreement upon Sixty (60) days written notice to the defaulting party, and/or exercise all other rights and remedies available to such party at law or in equity. In the event of any termination of this Agreement, Manager shall be paid all Fees due to the date of termination except as stated in Section 11. No delay or failure on the part of either party hereunder to declare the other party in default or exercise any remedies in respect of such default shall operate as waiver of such right to declare default and exercise such remedies.

    9.    **Binding Mediation/Arbitration.** The parties shall attempt to resolve a dispute between the parties through direct negotiation with the other parties. If the dispute is not resolved within Fifteen (15) Business Days after a demand for direct negotiation, the parties shall attempt to resolve the dispute through mediation conducted in Dallas, Texas. The fees and expenses of the mediator shall be paid equally by the parties hereto. If the mediator is unable to facilitate a settlement of the dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party(ies) may then seek relief through arbitration, which shall be binding, before a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "Association"). The place of arbitration shall be Dallas, Texas. Arbitration may be commenced at any time by any party seeking arbitration by written notice of the other party(ies) by first class mail, postage prepaid. The arbitrator shall be selected by the joint agreement of the party(ies), but if they do not so agree within Fifteen (15) Business Days after the date of the notice referred to above, the selection shall be made pursuant to the rules from the panels of arbitrators maintained by such Association. The arbitrator shall render his written decision (together with his opinion setting forth with particularity the reasons for his decision) within one hundred eighty (180) days of appointment. Any award rendered by the arbitrator shall be final, conclusive and binding upon the parties hereto and there shall be no right of appeal therefrom. Judgement upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The costs and expenses of arbitration including attorneys' fees and

expenses of the arbitrator shall be paid by the parties as the arbitrator may assess. The arbitrator shall not be permitted to award punitive or similar type damages under any circumstance. Except as set forth in the first clause of the first sentence of the Section 9, this arbitration provision shall constitute the sole and exclusive remedy for any dispute under this Agreement.

10.    **Sole Manager:** Manager shall be the sole provider of management services to the Facilities during the term of this Agreement, including the employment of outside managers and professionals required to provide quality care.

11.    **Deferred Management Fees:** In the event of termination of this Agreement, all such deferred amounts plus accrued interest, at Prime Rate, as stated in The Wall Street Journal, shall be immediately due and payable to Manager; provided, however, that to the extent that the Owner is unable to pay Operating Expenses due to a failure of Manager to perform it obligations under this Agreement or due to Manager's gross negligence or willful misconduct and Manager is terminated as manager as a result of such failure or action, then any such deferred amounts plus accrued interest, at prime as quoted in the Wall Street Journal, shall not be payable or owed to Manager by .

12.    **Miscellaneous:**

(a)    **Manager's Expenses:** Manager shall be responsible for all compensation, reimbursement, travel expenses or out-of-pocket cost incurred or paid by Manager to any of Manager's employees for work or activities necessary to carry out Manager's obligations under this Agreement, other than those expressly contained in this Agreement. Expenses directly related to the individual facilities will be reimbursed by the Owner.

(b)    Relationship of Parties: Manager is an independent contractor. Nothing contained in this Agreement shall constitute or be construed to be or create a partnership, joint venture or lease between the parties hereto with respect to the Facilities.

(c)    **Costs and Expenses of Facilities:** All fees, costs expenses and purchases arising out of, relating to or incurred in the operation of the Facilities including, without limitation, the fees, costs and expenses of outside Managers and professionals shall be the sole responsibility of Owner. Manager does not assume financial liability with respect to the above costs in the operation of the Facilities. The terms of this Section 12(c) shall survive the expiration or earlier termination of this Agreement.

(d)    **Books and Records:** All books, records, forms and reports prepared by Manager for or in connection with the operation of the Facilities shall be deemed to be the property of the Owner.

(e)    **Cooperation Upon Termination:** Upon the expiration or earlier termination of this Agreement, Manager shall cooperate fully with Owner in effecting an orderly transition of Owner to any new manager or managers of the Facilities in order to avoid any interruption in the rendering of services to Owner and residents of the Facilities. In connection therewith, Manager shall surrender to Owner all contracts, documents, books, records, forms and reports in the possession of Manager regarding the Facilities. Any and all forms of property and information that is owned or leased by Manager, or is otherwise proprietary in nature to Manager, which is provided at the Facilities to facilitate the terms of this Agreement, shall remain within the exclusive ownership of Manager upon termination. Owner may not use such property or information without obtaining prior written consent of Manager.

(f)    **Force Majeure:** Neither Owner nor Manager shall be required to perform any term, condition or covenant under this Agreement so long as such performance is delayed or prevented by any Acts of God, strikes, lockouts, material or labor restrictions by any governmental authority, civil riot or acts or terrorism, state of national emergency, flood or any other cause not reasonably within the control of the parties.

(g)    **Successors and Assigns:** This Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement will automatically be assigned to any and all subsequent parties in interest. Owner shall give Manager at least ninety (90) days prior written notice in the event of any transfer of ownership of the Facilities resulting in the assignment of this

4

Agreement. Manager shall give Owner prior written notice of any assignment of this Agreement. Manager shall not assign this Agreement to any entity other than an affiliate of Manager without the prior written approval of Owner. If assigned by either party, the rights, obligations and liabilities of the parties or their successor(s) will not be affected.

(h)    **Notices:** All notices, demands and requests to be made hereunder by one party to the other shall be in writing and shall be delivered by hand, mailed by certified mail, return receipt requested, or mailed by overnight courier service (such as Federal Express), with postage prepaid, to the address listed below:

    If to :

        JRL PROPERTIES INTERNATIONAL, INC.
        C/o Michael R. Allen, President
        4040 Red Bluff Road
        Pasadena, Texas 77503
        Phone (713) 475-0101
        Fax (713) 475-0111

    AND

        PLEXCO TRUST
        C/o J. Craig Hamilton, Jr., Trustee
        2494 17th Avenue
        Carmel, CA  93923
        Phone (831) 626-1580     Fax (831) 626-2918

    Copy To:

        Larry Langley, Esq.
        Akin, Gump, Strauss, Hauer & Feld, L.L.P.
        Frost Bank Plaza
        816 Congress Avenue, Suite 1900
        Austin, TX  78701
        Phone (512) 499-6293     Fax (512) 703-1111

    If to Manager:

        CONTINENTAL NURSING MANAGEMENT SERVICES, INC.
        C/o Kandy S. Apache
        4222 N. 12th Street, Suite 200
        Phoenix, Arizona  85014
        Phone (602) 230-1160
        Fax (602) 265-2613

All notice shall be deemed to effective upon receipt.

(i)    **Entire Agreement/Amendments:** This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof, and no prior oral or written representations, covenants or agreements between the parties with respect to the subject matter hereof shall be of any force or effect. Any amendments or modifications to this Agreement shall be of no force or effect unless in writing and signed by all parties hereto.

(j)    **Governing Law:** This Agreement, and all the terms and provisions hereof and the rights and obligations of the parties hereto, shall be construed and enforced in accordance with the laws of the State of Texas without reference to its conflict of laws and principles.

(k)    **Section Headings:** The section headings throughout this Agreement are provided for convenience of reference only, and the words contained therein shall not in any way be held to explain, modify or otherwise affect the interpretation, construction or meaning of the provisions of this Agreement.

(l)    **Severability:** If any term or provision of this Agreement or the application thereof to any person or circumstances shall be determined, by a court of competent jurisdiction, to be, to any extent, invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

5

(m)  **Waivers:**  No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instance, shall be deemed to be construed as a further and continuing waiver of any such other term, provision or condition of this Agreement.

(n)  **Access to Records:**  This Section is included herein because of the possible application of Section 1861(v)(1)(I) of the Social Security Act to this Agreement.  If such Section 1861(v)(1)(I) is not applicable to this Agreement under the terms of such section and the regulations promulgated thereunder, then this Section n shall be deemed null and void and no longer a part of this Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement through their duly authorized representatives on the day and date first above written.

JRL Properties International, Inc.

By:

Michael R. Allen, President

**MANAGER**

Continental Nursing Management Services, Inc.

By:

Kandy S. Apache

6

**Attachment A**

Management Services Agreement

| Name and Address for each Facility | No. Beds & Type |
|---|---|
| The Gardens Care Center<br>901 Pennsylvania Avenue<br>Fort Worth, Texas 76104 | 121 |
| Lufkin Nursing Center<br>2313 N. Raguet Street<br>Lufkin, Texas 75904 | 130 |

7

**Attachment B**

Management Services

A.    **Department Operations**:  Manager shall provide management support personnel and programs to interface with every department within each Facility, as appropriate, including:

| | |
|---|---|
| 1. Management and Administration | 9. Maintenance |
| 2. Nursing Service | 10. Housekeeping/Laundry |
| 3. Finance and Accounting | 11. Transportation |
| 4. Data Processing | 12. Community Relations |
| 5. Purchasing | 13. Therapy Services |
| 6. Personnel | 14. Social Services |
| 7. Labor Relations | 15. Recreational Therapy |
| 8. Dietary Services | 16. Marketing/Admissions |
| | 17. Chaplaincy |

As a basic component of management services, Manager's professionals will visit the Facilities and meet at the Facilities and meet with the respective department heads on a regular daily basis.  It will be the responsibility of each Manager's staff member to work with the department heads and staff in the identification, planning and reconciliation of problem areas and concerns.

B.    **Annual Budget and Annual Plan**:

(1)  Concurrently with the execution and delivery hereof and annually thereafter, at least seventy-five (75) days prior to the beginning of each of its Fiscal years, Manager shall prepare and cause to be delivered to the Owner, for Owner's approval, a written budget ("Annual Budget"), which shall contain an estimate for each such fiscal year on a monthly basis of all revenues, expenses, capital requirements, cash flows, full time equivalent staff requirements and occupancy and payer mix of the Facilities and the obligations with respect to outstanding indebtedness of the Facilities.  Such budgets shall designate separate payments in respect of any debt service requirements.  Owner's approval of the Annual Budget shall not be reasonably withheld.  Manager may revise the Annual Budget from time to time during a fiscal year to reflect any significant additional unanticipated items of income or expense.  Any such revision shall be submitted to Owner for approval, which approval shall not be unreasonably withheld.  Manager shall provide Owner with the data and information utilized in preparing the Annual Budget or any revisions thereto.  If Owner objects to a proposed Annual Budget or any revisions thereto, the most recently approved Annual Budget shall remain in effect.

(2)  Expenditures for all items not budgeted at the time of preparation of the Annual Budget, and reasonably deemed necessary by Manager, may be made upon notification to Owner, except that expenditures for unbudgeted items may not be made without Owner's approval, which shall not be unreasonably withheld.  Notification by E-mail or letter approval.  Verbal notification is acceptable with either an E-mail or letter immediately following.

(3)  Concurrently with the execution and delivery hereof and Annually thereafter, at the same time as the Annual Budget is submitted to Owner, Manager shall submit to Owner, for Owner's approval, a plan for organization of the business and services of the Facilities and a narrative report of Manager's major management goals and intended actions for the ensuing year, in reasonable detail, with reference to the Annual Budget so as to enable Owner to evaluate Manager's intended conduct of the affairs of the Facilities during that period ("Annual Plan").

C.    **Bank Accounts: Flow of Funds**:

8

(1) All sums received and disbursed in connection with the operation of the Facilities shall be initially deposited in FDIC-insured account(s), in the name of Owner, and disbursed in accordance with a system for controlling the flow of funds which shall be mutually established by Owner and Manager. Such account(s) shall be established in such numbers and at such bank(s) or financial institutions as Owner and Manager shall mutually agree are necessary for the efficient operation of the Facilities. Either Owner or designees of Manager, as agent of Owner, shall be authorized to make deposits and draw upon such accounts for expenditures authorized by the Annual Budget. Owner may, in its discretion, revoke by written notice to Manager the authorization of Manager's designees to draw upon such account(s), and within thirty (30) days thereafter, Manager shall choose new designees to draw on such accounts, subject to Owner's approval, which shall not be unreasonably withheld. may establish lines of credit with commercial lenders that may require receipts to be deposited in a lock box prior to becoming available to operating account(s).

(2) In no event shall amounts deposited in any account(s) established under this Agreement be commingled with any other funds of Manager.

D.   **Staff: Salaries of Personnel:**   Manager shall hire, train, promote, discharge and supervise the work of the executive staff and all employees of the Facilities at wage and salary rates for various job classifications, each of which shall be specified in the Annual Budget.

E.   **Accounting and Records:**   Manager shall supervise an accounting department, which shall be staffed by employees of Owner and which shall have appropriate accounting and cost control systems. The costs of the accounting staff and systems shall be the Owner's responsibility. Manager shall cause the department to prepare and file all necessary reports with respect to withholding taxes, social security taxes, unemployment insurance, disability insurance, the Fair Labor Sandra's Act, third party reimbursement and all other statements and reports pertaining to labor employed on Owner's payroll in or about the Facilities or payments with respect to the Facilities and all reports required to be made pursuant to the applicable debt instruments. The accounting department shall maintain accounting, billing and collection records for the Facilities, provide for the orderly payment of Owner's employees' salaries and all bills and invoices issued with respect to the Facilities as a result of its operations, supervise collection of accounts and moneys owed to Owner, and process all possible third party claims on behalf of Owner for medical services provided to residents, including, without limitation and at Owner's or Manager's direction, contesting adjustments and denials by governmental agencies and third party payors. The books and records kept by Manager for the Facilities shall be maintained at each respective Facility or at the registered corporate office of although Manager shall have the right to maintain copies of such records at its home office for the purpose of providing services under this Agreement. Manager shall make available to Owner, its agents, accountants and attorneys, during normal business hours, all books and records pertaining to the Facilities, and Manager shall promptly respond to questions of Owner with respect to such books and records and shall confer with Owner at all reasonable times, upon request, concerning operation of the Facilities. Manager shall assist and cooperate with Owner's auditors in conducting any audit of the Facility's financial condition and results of the operation. Upon termination of this Agreement for any reason, all source documents, work papers, financial statements relating to past periods and other supporting documents shall be and remain the property of Owner. A financial statement shall be furnished by Manager to Owner monthly throughout this Agreement.

F.   **Fees and Charges:**   Subject to the approval and direction of Owner and any limitations imposed by any agreements with residents at the Facilities, Manager shall establish, maintain, revise and administer the overall charge structure of the Facilities. A schedule of such charges and fees shall be submitted to Owner on an annual basis in conjunction with the Annual Budget and shall be subject to the approval procedure set forth in Section B above.

G.   **Complaints:**   Manager shall receive, consider and handle any complaints from residents, guests or users of any of the services of the Facilities. Manager shall notify Owner of all material complaints, lawsuits, or threats of lawsuits received by Manager.

H.   **Health Services:**   Manager shall manage the Facilities in an effective and efficient manner, in accordance with all regulatory provisions. Manager shall provide all medical services to be provided by Owner under all agreements with residents, including all customary services provided at a nursing home. Manager shall develop on Owner's behalf a resident care policy manual for the operation of the Facilities prior to the Commencement Date of this Agreement, so that such manual can be implemented commencing on the Commencement Date. The Facilities shall be staffed and attended by personnel required by law and otherwise as customarily found at a similar situated nursing home. Manager shall develop on Owner's behalf and implement a policy and procedures manual for all personnel employed in

9

connection with the facilities which conforms to Owner's benefit and personnel policies, and shall devise a system for documenting the day to day activities at the Facilities, including resident visits, stays and discharges, physician visits, collection procedures from residents and third party payors, medical charts and record and all documentation necessary in order to operate the Facilities in a quality manner. Manager shall effectively develop and maintain transfer agreements with one or more local acute care hospitals to provide necessary care for residents at the nursing home. Manager shall provide a Quality Indicator Report upon Owner's request.

**I.    Pharmaceutical Services:**  Manager shall ensure that all pharmaceutical services incidental to the operation of the Facilities are provided in a quality manner. Manager shall arrange for the procurement of all necessary drugs and other pharmaceutical items necessary for residents at the Facilities and shall develop and implement a procedure for dispensing drugs on an inpatient and outpatient basis.

**J.    Housekeeping Service:**  Manager shall ensure that laundry and linen services shall be provided to all residents at the Facilities. Manager shall ensure that housekeeping and janitorial services and all necessary supplies and equipment shall be provided in order to maintain the units and the Facilities in a clean and sanitary manner.

**K.    General:**  Manager shall provide or arrange for all further services which Owner is obligated to provide to resident(s) under the terms of all agreements with residents, copies of which shall be furnished to Owner.

**L.    Dietary Services:**  Manager shall provide or arrange for all necessary staff, supplies, equipment and food necessary to provide for the nutritional needs of each resident. Manager shall develop on Owner's behalf and implement a policy and procedures manual regarding dietary care and food services to be provided at the Facilities. The policy and procedures manual shall include food preparation procedure, procurement planning, and a system for quality control and standards of dining room service consistent with all applicable regulations.

**M.    Routine Repairs and Replacements:**  Manager shall make or cause to be made such alterations, repairs, decorations or replacements at the Facilities as Manager or Owner deem reasonable to fulfill Owner's obligations to residents, all of which expenditures shall be made in accordance with the Annual Budget approved by Owner. Manager shall arrange for all staff, supplies, decorations and replacements.

**N.    Capital Expenditures and Replacements:**  Owner recognized the necessity of replacement of furnishings or equipment at the Facilities and other ordinary capital replacement items, (collectively, "Capital Replacements") Owner agrees to expend such approved budgeted amounts for Capital Replacements as shall be required in the normal and ordinary course of operations of the Facilities, and to renovate, modernized and improve the Facilities to preserve the health, safety and/or welfare of residents. Manager shall arrange for the purchase and the installation of such Capital Replacements, to the extent budgeted, and shall supervise such installation.

**O.    Legal Actions:**  Manager shall institute, with the prior written approval of Owner, in the name and at the expense of Owner, any necessary legal actions or proceedings to collect obligations owing to the Facilities or to cancel or terminate any contract with the Facilities for breach thereof or default thereunder. Manager shall cooperate with Owner and Owner's counsel whenever reasonably requested and in any and all governmental and private approval processes engage in on behalf of Owner.

**P.    Owner's Indebtedness:**  Manager shall take all actions within its power to cause the operation of the Facilities to comply with all the terms, conditions and obligations contained in any note, loan agreement, mortgage or other agreement executed by Owner which relates to the Facilities. Owner shall provide Manager with true and correct copies of any such note, loan agreement, mortgage or other agreement.

**Q.    Waiting List: Transfer of Units:**  Manager shall cause each Facility to maintain a waiting list for the availability of beds in accordance with applicable laws and regulations.

**R.    Right to Subcontract:**  The parties agree that Manager with the approval of Owner, which approval cannot be unreasonably withheld, at Manager's expense, may enter into agreements or subcontracts for performance of services required to be provided by Manager hereunder which may include agreements or subcontracts with affiliates of Manager and Owner.

EXHIBIT C

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY | Reserved for Clerk's File Stamp |
|---|---|
| Allen, Michael R et al,<br>    Plaintiff/Petitioner<br><br>vs.<br><br>Hamilton, Craig J et al,<br>    Defendant/Respondent | **FILED**<br>DEC 0 1 2006<br>LISA M. GALDOS<br>CLERK OF THE SUPERIOR COURT<br>APRIL CAMPBELL DEPUTY |
| **CASE MANAGEMENT NOTICE** | Case No. M81975 |

**Case Management Conference Date:  June 7, 2007 at 9:00 a.m.**

1.  NOTICE is hereby given that a CASE MANAGEMENT STATEMENT shall be filed with the Court and served on all parties NO LATER than:  30 days before the above date of the initial CASE MANAGEMENT CONFERENCE.

2.  No party may stipulate to extend any of the dates set above.

3.  At the CASE MANAGEMENT CONFERENCE, it is expected that trial counsel for each party and each self-represented party shall attend and be fully prepared to participate effectively in the conference.

4.  On receipt of the CASE MANAGEMENT STATEMENT and at or before the CASE MANAGEMENT CONFERENCE the Court may make the following orders:

    a.  refer the matter to arbitration, the court-directed mediation program, or other alternative dispute resolution procedures;

    b.  identify the case as one which may be protracted and in need of special attention;

    c.  assign the case to a particular judge for all purposes;

    d.  assign a mandatory settlement conference and trial date;

    e.  make orders establishing discovery schedules and cut-offs, including expert witness disclosure and discovery;

    f.  make appropriate Trial Management Orders; and/or

    g.  make any other orders to achieve the interests of justice and the timely disposition of the case, including the setting of additional Status Conferences.

5.  It is the policy of this Court that all complaints and cross-complaints be filed and served, all challenges to the pleadings be heard, and the matter be at-issue no later than 180 days from the filing of the complaint.  It is the policy of this Court that all civil matters be resolved in no more than 12 to 24 months of the filing of the complaint.

6.  Failure to file the CASE MANAGEMENT STATEMENT, attend the CASE MANAGEMENT CONFERENCE and participate effectively, or comply with any CASE AND TRIAL MANAGEMENT RULES may result in sanction.

7.  It is the responsibility of the parties and/or their attorneys to be familiar with the Monterey County Case and Trial Management Policies and Rules and to comply therewith.

BY ORDER OF THE PRESIDING JUDGE
APRIL CAMPBELL

Date: December 1, 2006        By: _____
                                  Deputy Clerk

# Alternative Dispute Resolution
## OPTIONS FOR RESOLVING YOUR DISPUTE

**There Are Alternatives to Going to Trial**
Did you know that 95 percent of all civil cases filed in court are resolved without going to trial? Many people use processes other than trial to resolve their disputes. These alternative processes, known as Alternative Dispute Resolution or ADR, are typically less formal and adversarial than trial, and many use a problem-solving approach to help the parties reach agreement.

**Advantages of ADR**
Here are some potential advantages of using ADR:

- **Save Time:** A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.
- **Save Money:** When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, and expert's fees.
- **Increase Control over the Process and the Outcome:** In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.
- **Preserve Relationships:** ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.
- **Increase Satisfaction:** In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.
- **Improve Attorney-Client Relationships:** Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

Because of these potential advantages, it is worth considering using ADR early in a lawsuit or even before you file a lawsuit.

**What Are the ADR Options?**
The most commonly used ADR processes are mediation, arbitration, neutral evaluation, and settlement conferences.

### Mediation

In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties. The Monterey County Superior Court offers a Court-Directed Mediation Program.

**Cases for Which Mediation May Be Appropriate:** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use.

Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May Not Be Appropriate:** Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. There-fore, it may not be a good choice if the parties have a history of abuse or victimization.

## Arbitration

In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed.

Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision in binding arbitration. *Nonbinding arbitration* means that the parties are free to request a trial if they do not accept the arbitrator's decision. The Monterey County Superior Court offers a nonbinding judicial arbitration program.

**Cases for Which Arbitration May Be Appropriate:** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May Not Be Appropriate:** If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

## Neutral Evaluation

In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is nonbinding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate:** Neutral evaluation may be most appropriate in cases in which there are technical issues that require expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate:** Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

## Settlement Conference

Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):

TELEPHONE NO.:
EMAIL ADDRESS (Optional):          FAX NO. (Optional)
ATTORNEY FOR (Name):
SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY
MAILING ADDRESS: 1200 Aguajito Road
CITY AND ZIP CODE: Monterey, CA 93940
PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| Request to Vacate or Continue Initial Case Management Conference and Order | Case Number: |
|---|---|

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:          Time:     Dept.:          Div.:     Room:

> IF APPLICABLE, THIS REQUEST AND ORDER MUST BE FILED CONCURRENTLY WITH THE CASE MANAGEMENT STATEMENTS, WHICH ARE DUE NO LATER THAN 30 DAYS BEFORE THE INITIAL CASE MANAGEMENT CONFERENCE.
> PER LOCAL RULE 6.08(g), IF THE PARTIES DO NOT RECEIVE A SIGNED COPY OF THE ORDER GRANTING THE REQUEST, THEY MUST ATTEND THE CASE MANAGEMENT CONFERENCE.

Counsel and the parties certify that the initial Case Management Conference should be vacated or continued for the following reasons (circle one):

1. All parties have appeared and agree to engage in the below ADR program (check one):

   ☐ Court-Directed mediation          ☐ Private mediation
   ☐ Nonbinding judicial arbitration     ☐ Private arbitration          THE
   ☐ Other:

   PARTIES AGREE TO COMPLETE THE ALTERNATIVE DISPUTE RESOLUTION PROGRAM WITHIN 90 DAYS OF THE FILING OF THIS FORM. Further Case Management Conference is requested.

2. Case is concluded and judgment or dismissal has been entered as to all parties.

3. Case has settled; dismissal shall be filed on or before _____

4. Case is at-issue and all parties agree that matter may be set for trial without the necessity of a Case Management Conference.

5. All defendants have not been served and the plaintiff has been granted an extension by the court until _____ to complete service on all defendants.  Further Case Management Conference is requested.

6. A defendant has filed bankruptcy; case should be stayed pending the completion of bankruptcy. Plaintiff shall file a Supplemental Case Management Statement within ten (10) days of any action by the debtor or the Bankruptcy Court that would act as a lifting of said stay.

7. Case has been removed to Federal Court.  Plaintiff shall file a Supplemental Case Management Statement within ten (10) days of any remand back to Superior Court or of any judgment or dismissal filed in the Federal Court.

Page 4 of 5

| Request to Vacate or Continue Initial Case Management Conference and Order | Case Number: |
|---|---|

8.   Plaintiff has obtained a default as to all defendants and will perfect the default by entry of court or clerk judgment in timely manner.  Further Case Management Conference is requested.

9.   All defendants have appeared and discovery is proceeding in a timely manner.  For reasons set forth in the parties' Case Management Statements, the case should be designated (circle one) Category I, Category II or Category III.    Parties anticipate case will be ready to set for trial as of _____.  Further Case Management Conference is requested.

10.  Other: _____

_____

_____

_____. Further Case Management Conference is requested.

_____          _____
Counsel for Plaintiff (print name)                    Counsel for Defendant (print name)

_____          _____
Signature                                              Signature

_____          _____
Counsel for Plaintiff (print name)                    Counsel for Defendant (print name)

_____          _____
Signature                                              Signature

*For additional parties, attach additional signature pages as needed.*

---

Good Cause appearing, IT IS SO ORDERED that the Case Management Conference set for

_____ is vacated.

☐ Supplemental Case Management Statements shall be filed as set forth in 6 or 7 above.

☐ Receipt of Dismissal is set for _____.

☐ Further Case Management Conference is set for _____
Parties shall file Case Management Statements prior to said hearing per Local Rule 6.08(e).

**PLAINTIFF MUST SERVE A COPY OF THIS ORDER ON ALL PARTIES.**

Dated: _____          _____
                                        *Judge of the Superior Court*